# COOPER INDUSTRIES, INC. *v.* LEATHERMAN TOOL GROUP, INC.

No. 99–2035. Argued February 26, 2001—Decided May 14, 2001

*William Bradford Reynolds* argued the cause for petitioner. With him on the briefs was *Bradley J. Schlozman*.

*Jonathan S. Massey* argued the cause for respondent. With him on the brief were *Laurence H. Tribe, J. Peter Staples,* and *Thomas C. Goldstein.**

JUSTICE STEVENS delivered the opinion of the Court.

A jury found petitioner guilty of unfair competition and awarded respondent $50,000 in compensatory damages and $4.5 million in punitive damages. The District Court held that the punitive damages award did not violate the Federal Constitution. The Court of Appeals concluded that "the district court did not abuse its discretion in declining to reduce the amount of punitive damages." App. to Pet. for Cert. 4a. The issue in this case is whether the Court of Appeals applied the wrong standard of review in considering the constitutionality of the punitive damages award.

---

*Briefs of *amici curiae* urging reversal were filed for American Home Products Corp. et al. by *Walter E. Dellinger* and *John F. Daum;* for General Dynamics Corp. by *S. Thomas Todd;* and for the Product Liability Advisory Council, Inc., by *Griffin B. Bell, Chilton Davis Varner, Paul D. Clement,* and *Jeffrey S. Bucholtz.*

*Jeffrey Robert White* and *Frederick M. Baron* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Alliance of American Insurers et al. by *Richard Hodyl, Jr.;* for the American Tort Reform Association et al. by *Victor E. Schwartz, Mark A. Behrens, Leah Lorber, Jan S. Amundson, J. V. Schwan, David F. Zoll, Donald D. Evans, Jeffrey L. Gabardi,* and *Louis Saccoccio;* for the Association of American Railroads by *Carter G. Phillips, Gene C. Schaerr, Stephen B. Kinnaird,* and *Daniel Saphire;* for the California Employment Law Council et al. by *William J. Kilberg* and *Thomas G. Hungar;* for the Chamber of Commerce of the United States by *Andrew L. Frey, Evan M. Tager,* and *Robin S. Conrad;* for the Washington Legal Foundation et al. by *Arvin Maskin, Daniel J. Popeo,* and *Paul D. Kamenar;* and for Arthur F. McEvoy by *Kenneth Chesebro* and *Mr. McEvoy, pro se.*

## I

The parties are competing tool manufacturers. In the 1980's, Leatherman Tool Group, Inc. (Leatherman or respondent), introduced its Pocket Survival Tool (PST). The Court of Appeals described the PST as an

> "ingenious multi-function pocket tool which improves on the classic 'Swiss army knife' in a number of respects. Not the least of the improvements was the inclusion of pliers, which, when unfolded, are nearly equivalent to regular full-sized pliers. . . . Leatherman apparently largely created and undisputedly now dominates the market for multi-function pocket tools which generally resemble the PST." *Leatherman Tool Group, Inc.* v. *Cooper Industries,* 199 F. 3d 1009, 1010 (CA9 1999).

In 1995, Cooper Industries, Inc. (Cooper or petitioner), decided to design and market a competing multifunction tool. Cooper planned to copy the basic features of the PST, add a few features of its own, and sell the new tool under the name "ToolZall." Cooper hoped to capture about 5% of the multi-function tool market. The first ToolZall was designed to be virtually identical to the PST,[1] but the design was ultimately modified in response to this litigation. The controversy to be resolved in this case involves Cooper's improper advertising of its original ToolZall design.

Cooper introduced the original ToolZall in August 1996 at the National Hardware Show in Chicago. At that show, it used photographs in its posters, packaging, and advertising materials that purported to be of a ToolZall but were actually of a modified PST. When those materials were prepared, the first of the ToolZalls had not yet been manufac-

---

[1] The ToolZall was marked with a different name than the PST, was held together with different fasteners, and, in the words of the Court of Appeals, "included a serrated blade and certain other small but not particularly visible differences." *Leatherman Tool Group, Inc.* v. *Cooper Industries,* 199 F. 3d 1009, 1010 (CA9 1999).

tured. A Cooper employee created a ToolZall "mock-up" by grinding the Leatherman trademark from handles and pliers of a PST and substituting the unique fastenings that were to be used on the ToolZall. At least one of the photographs was retouched to remove a curved indentation where the Leatherman trademark had been. The photographs were used, not only at the trade show, which normally draws an audience of over 70,000 people, but also in the marketing materials and catalogs used by Cooper's sales force throughout the United States. Cooper also distributed a touched-up line drawing of a PST to its international sales representatives.[2]

Shortly after the trade show, Leatherman filed this action asserting claims of trade-dress infringement, unfair competition, and false advertising under § 43(a) of the Trademark Act of 1946 (Lanham Act), 60 Stat. 441, as amended, 15 U. S. C. § 1125(a) (1994 ed. and Supp. V), and a common-law claim of unfair competition for advertising and selling an "imitation" of the PST. In December 1996, the District Court entered a preliminary injunction prohibiting Cooper from marketing the ToolZall and from using pictures of the modified PST in its advertising. Cooper withdrew the original ToolZall from the market and developed a new model with plastic coated handles that differed from the PST. In November 1996, it had anticipatorily sent a notice to its sales personnel ordering a recall of all promotional materials containing pictures of the PST, but it did not attempt to retrieve the materials it had sent to its customers until the following April. As a result, the offending promotional materials continued to appear in catalogs and advertisements well into 1997.

After a trial conducted in October 1997, the jury returned a verdict that answered several special interrogato-

---

[2] To "create" the drawing, a Cooper manager photocopied a line-art drawing of a PST and then "whited out" Leatherman's trademark. App. 43–47.

ries. With respect to the Lanham Act infringement claims, the jury found that Leatherman had trademark rights in the overall appearance of the PST and that the original Tool-Zall infringed those rights but that the infringement had not damaged Leatherman. It then found that the modified ToolZall did not infringe Leatherman's trademark rights in the PST. With respect to the advertising claims, it found Cooper guilty of passing off, false advertising, and unfair competition and assessed aggregate damages of $50,000 on those claims. It then answered "Yes" to the following interrogatory:

> "Has Leatherman shown by clear and convincing evidence that by engaging in false advertising or passing off, Cooper acted with malice, or showed a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to Leatherman's rights?" App. 18.

Because it answered this question in the affirmative, the jury was instructed to determine the "amount of punitive damages [that] should be awarded to Leatherman." *Ibid.* The jury awarded $4.5 million. *Ibid.*

After the jury returned its verdict, the District Court considered, and rejected, arguments that the punitive damages were "grossly excessive" under our decision in *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559 (1996). See App. to Pet. for Cert. 24a. It then entered its judgment, which provided that 60% of the punitive damages would be paid to the Criminal Injuries Compensation Account of the State of Oregon. The judgment also permanently enjoined Cooper from marketing its original ToolZall in the United States or in 22 designated foreign countries.

On appeal, Cooper challenged both the District Court's injunction against copying the PST and the punitive damages award. The Court of Appeals issued two opinions. In its published opinion it set aside the injunction. *Leather-*

*man Tool Group, Inc.* v. *Cooper Industries, Inc., supra.* It held that the overall appearance of the PST was not protected under the trademark laws because its distinguishing features, and the combination of those features, were functional. Accordingly, even though Cooper had deliberately copied the PST, it acted lawfully in doing so.[3]

In its unpublished opinion, the Court of Appeals affirmed the punitive damages award. It first rejected Cooper's argument that the Oregon Constitution, which has been interpreted to prohibit awards of punitive damages for torts that impose liability for speech, precluded the jury's award of such damages in this case. It then reviewed the District Court's finding that the award "was proportional and fair, given the nature of the conduct, the evidence of intentional passing off, and the size of an award necessary to create deterrence to an entity of Cooper's size" and concluded "that the award did not violate Cooper's due process rights" under the Federal Constitution. App. to Pet. for Cert. 3a, judgt. order reported at 205 F. 3d 1351 (CA9 1999). It noted that the "passing off" in this case was "very unusual" because "even assuming PST is a superior product," no superior features of the PST were perceivable in the photographs. App. to Pet. for Cert. 3a. "Any customer who bought based on what the photographs *showed* would have received essentially that for which he or she paid." *Ibid.* Thus, Cooper's use of the photographs of the PST did not involve "the

---

[3] Because this holding removed the predicate for the award of fees under the Lanham Act, see n. 2, *supra,* the Court of Appeals set aside that award and directed the District Court, on remand, to consider whether the evidence of passing off, standing alone, was sufficient to warrant a fee award. The Court of Appeals noted that the jury verdict form did not distinguish between passing off as a Lanham Act claim and passing off as a matter of state law. Although a fee award under § 35(a) could not be supported unless the federal statute was violated, there is no reason to believe that any possible difference between federal and state passing off would affect the constitutionality of the punitive damages award.

same sort of potential harm to Leatherman or to customers as that which may arise from traditional passing off." *Id.,* at 4a. The Court of Appeals made clear, however, that it did not condone the passing off. "[A]t a minimum," it observed, "[the passing off] gave Cooper an unfair advantage" by allowing it to use Leatherman's work product "to obtain a 'mock-up' more cheaply, easily, and quickly" than if it had waited until its own product was ready. *Ibid.* Accordingly, the Court of Appeals concluded, "the district court did not abuse its discretion in declining to reduce the amount of punitive damages." *Ibid.*

Cooper's petition for a writ of certiorari asked us to decide whether the Court of Appeals reviewed the constitutionality of the punitive damages award under the correct standard and also whether the award violated the criteria we articulated in *Gore.* We granted the petition to resolve confusion among the Courts of Appeals on the first question.[4] 531 U. S. 923 (2000). We now conclude that the constitutional issue merits *de novo* review. Because the Court of Appeals applied an "abuse of discretion" standard, we remand the case for determination of the second question under the proper standard.

---

[4] Respondent and its *amicus* at times appear to conflate the question of the proper standard for reviewing the District Court's due process determination with the question of the substantive standard for determining the jury award's conformity with due process in the first instance. See Brief for Arthur F. McEvoy as *Amicus Curiae* 13 ("[O]n appeal the litigant's objection to the *substance* of the jury's holding—whether on liability or damages—should be evaluated under a 'rational factfinder' standard . . ."); Brief for Respondent 13. The former is the question we agreed to review. The latter question has already been answered in *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559 (1996). Thus, our rejection in *TXO Production Corp.* v. *Alliance Resources Corp.,* 509 U. S. 443 (1993), of "heightened scrutiny" of punitive damages awards, see *id.,* at 456, is not only wholly consistent with our decision today, it is irrelevant to our resolution of the question presented.

## II

Although compensatory damages and punitive damages are typically awarded at the same time by the same decision-maker, they serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. See Restatement (Second) of Torts § 903, pp. 453–454 (1979); *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1, 54 (1991) (O'CONNOR, J., dissenting). The latter, which have been described as "quasi-criminal," *id.,* at 19, operate as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. See *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 350 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence"); *Haslip,* 499 U. S., at 54 (O'CONNOR, J., dissenting) ("[P]unitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible").[5]

Legislatures have extremely broad discretion in defining criminal offenses, *Schall* v. *Martin,* 467 U. S. 253, 268–269, n. 18 (1984), and in setting the range of permissible punishments for each offense, *ibid.; Solem* v. *Helm,* 463 U. S. 277, 290 (1983). Judicial decisions that operate *within* these legislatively enacted guidelines are typically reviewed for abuse of discretion. See, *e. g., Koon* v. *United States,* 518 U. S. 81, 96, 99–100 (1996); cf. *Apprendi* v. *New Jersey,* 530 U. S. 466, 481 (2000) (it is permissible "for judges to exercise dis-

---

[5] See also Sunstein, Kahneman, & Schkade, Assessing Punitive Damages (With Notes on Cognition and Valuation in Law), 107 Yale L. J. 2071, 2074 (1998) ("[P]unitive damages may have a retributive or expressive function, designed to embody social outrage at the action of serious wrongdoers").

cretion . . . in imposing a judgment *within the range* prescribed by statute").

As in the criminal sentencing context, legislatures enjoy broad discretion in authorizing and limiting permissible punitive damages awards. Cf. *Gore*, 517 U. S., at 568 ("States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case"). A good many States have enacted statutes that place limits on the permissible size of punitive damages awards.[6] When juries make particular awards within those limits, the role of the trial judge is "to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U. S. 257, 279 (1989). If no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's "determination under an abuse-of-discretion standard." *Ibid.*[7]

Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion. That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and

---

[6] See *Gore*, 517 U. S., at 614–619 (GINSBURG, J., dissenting). Since our decision in *Gore*, four additional States have added punitive damages caps: Alabama, Alaska, North Carolina, and Ohio. See Ala. Code §6–11–21 (Supp. 2000); Alaska Stat. Ann. §09.17.020 (2000); N. C. Gen. Stat. §1D–25 (1999); Ohio Rev. Code Ann. §2315.21 (Supp. 2000).

[7] In *Browning-Ferris*, the petitioner did argue that the award violated the Excessive Fines Clause of the Eighth Amendment, but we held the Clause inapplicable to punitive damages. The petitioner's reliance on the Due Process Clause of the Fourteenth Amendment was unavailing because that argument had not been raised in the District Court, the Court of Appeals, or the certiorari petition. See 492 U. S., at 276–277.

unusual punishments applicable to the States. *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam).* The Due Process Clause of its own force also prohibits the States from imposing "grossly excessive" punishments on tortfeasors, *Gore,* 517 U. S., at 562; *TXO Production Corp.* v. *Alliance Resources Corp.,* 509 U. S. 443, 453–455 (1993) (plurality opinion).

The Court has enforced those limits in cases involving deprivations of life, *Enmund* v. *Florida,* 458 U. S. 782, 787, 801 (1982) (death is not "a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life"); *Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (opinion of White, J.) (sentence of death is "grossly disproportionate" and excessive punishment for the crime of rape);[8] deprivations of liberty, *Solem* v. *Helm,* 463 U. S., at 279, 303 (life imprisonment without the possibility of parole for nonviolent felonies is "significantly disproportionate"); and deprivations of property, *United States* v. *Bajakajian,* 524 U. S. 321, 324 (1998) (punitive forfeiture of $357,144 for violating reporting requirement was "grossly disporportional" to the gravity of the offense); *Gore,* 517 U. S., at 585–586 ($2 million punitive damages award for failing to advise customers of minor predelivery repairs to new automobiles was "grossly excessive" and therefore unconstitutional).

In these cases, the constitutional violations were predicated on judicial determinations that the punishments were "grossly disproportional to the gravity of . . . defendant[s'] offense[s]." *Bajakajian,* 524 U. S., at 334; see also *Gore,* 517 U. S., at 585–586; *Solem,* 463 U. S., at 303; *Coker,* 433 U. S., at 592 (opinion of White, J.). We have recognized that the relevant constitutional line is "inherently imprecise," *Ba-*

---

[8] Although disagreeing with the specific holding in *Coker,* Chief Justice Burger and then-JUSTICE REHNQUIST accepted the proposition that the "concept of disproportionality bars the death penalty for minor crimes." 433 U. S., at 604 (Burger, C. J., dissenting).

*jakajian,* 524 U. S., at 336, rather than one "marked by a simple mathematical formula," *Gore,* 517 U. S., at 582. But in deciding whether that line has been crossed, we have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability, see, *e. g., Bajakajian,* 524 U. S., at 337; *Gore,* 517 U. S., at 575–580; *Solem,* 463 U. S., at 290–291; *Enmund,* 458 U. S., at 798; *Coker,* 433 U. S., at 598 (opinion of White, J.); the relationship between the penalty and the harm to the victim caused by the defendant's actions, see, *e. g., Bajakajian,* 524 U. S., at 339; *Gore,* 517 U. S., at 580–583; *Solem,* 463 U. S., at 293; *Enmund,* 458 U. S., at 798; *Coker,* 433 U. S., at 598 (opinion of White, J.); and the sanctions imposed in other cases for comparable misconduct, see, *e. g., Bajakajian,* 524 U. S., at 340–343; *Gore,* 517 U. S., at 583–585; *Solem,* 463 U. S., at 291; *Enmund,* 458 U. S., at 789–796; *Coker,* 433 U. S., at 593–597 (opinion of White, J.). Moreover, and of greatest relevance for the issue we address today, in each of these cases we have engaged in an independent examination of the relevant criteria. See, *e. g., Bajakajian,* 524 U. S., at 337–344; *Gore,* 517 U. S., at 575–586; *Solem,* 463 U. S., at 295–300; *Enmund,* 458 U. S., at 788–801; *Coker,* 433 U. S., at 592–600 (opinion of White, J.).

In *Bajakajian,* we expressly noted that the courts of appeals must review the proportionality determination *"de novo"* and specifically rejected the suggestion of the respondent, who had prevailed in the District Court, that the trial judge's determination of excessiveness should be reviewed only for an abuse of discretion. "The factual findings made by the district courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous. . . . But the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate." 524 U. S., at 336–337, n. 10 (citing *Ornelas* v. *United States,* 517 U. S. 690, 697 (1996)).

Likewise, in *Ornelas*, we held that trial judges' determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. The reasons we gave in support of that holding are equally applicable in this case. First, as we observed in *Ornelas*, the precise meaning of concepts like "reasonable suspicion" and "probable cause" cannot be articulated with precision; they are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Id.*, at 696. That is, of course, also a characteristic of the concept of "gross excessiveness." Second, "the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles." *Id.*, at 697. Again, this is also true of the general criteria set forth in *Gore;* they will acquire more meaningful content through case-by-case application at the appellate level. "Finally, *de novo* review tends to unify precedent" and " 'stabilize the law.' " 517 U. S., at 697–698. JUSTICE BREYER made a similar point in his concurring opinion in *Gore:*

> "Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself." 517 U. S., at 587.

Our decisions in analogous cases, together with the reasoning that produced those decisions, thus convince us that courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards.[9]

---

[9] Contrary to respondent's assertion, Brief for Respondent 12–13, our decision today is *supported* by our reasoning in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U. S. 1, 20–21 (1991). In that case, we emphasized the

## III

"Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, see, *e. g.,* [*St. Louis, I. M. & S. R. Co.* v. *Craft,* 237 U. S. 648 (1915)], the level of punitive damages is not really a 'fact' 'tried' by the jury." *Gasperini* v. *Center for Humanities, Inc.,* 518 U. S. 415, 459 (1996) (SCALIA, J., dissenting). Because the jury's award of punitive damages does not constitute a finding of "fact," appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment concerns raised by respondent and its *amicus.*[10] See Brief for Respondent 18–24; Brief for Association of Trial Lawyers of America as *Amicus Curiae* 17–20. Our decisions in *Gasperini* and *Hetzel* v. *Prince William County,* 523 U. S. 208 (1998) *(per curiam),* both of which concerned compensatory damages, are not to the contrary.[11]

importance of appellate review to ensuring that a jury's award of punitive damages comports with due process. See *id.,* at 20–21 ("[A]ppellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition").

[10] Respondent argues that our decision in *Honda Motor Co.* v. *Oberg,* 512 U. S. 415 (1994), rests upon the assumption that punitive damages awards are findings of fact. In that case, we held that the Oregon Constitution, which prohibits the reexamination of any "fact tried by a jury," Ore. Const., Art. VII, § 3, violated due process because it did not allow for any review of the constitutionality of punitive damages awards. Respondent claims that, because we considered this provision of the Oregon Constitution to cover punitive damages, we implicitly held that punitive damages are a "fact tried by a jury." Brief for Respondent 27–28. It was the Oregon Supreme Court's interpretation of that provision, however, and not our own, that compelled the treatment of punitive damages as covered. See *Oberg,* 512 U. S., at 427; see also *Van Lom* v. *Schneiderman,* 187 Ore. 89, 93, 210 P. 2d 461, 462 (1949) (construing the Oregon Constitution).

[11] Nor does the historical material upon which respondent relies so extensively, see Brief for Respondent 19–24, conflict with our decision to require *de novo* review. Most of the sources respondent cites merely

It might be argued that the deterrent function of punitive damages suggests that the amount of such damages awarded is indeed a "fact" found by the jury and that, as a result, the Seventh Amendment is implicated in appellate review of that award. Some scholars, for example, assert that punitive damages should be used to compensate for the underdeterrence of unlawful behavior that will result from a defendant's evasion of liability. See Polinsky & Shavell, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 869, 890–891

---

stand for the proposition that, perhaps because it is a fact-sensitive undertaking, determining the amount of punitive damages should be left to the discretion of the jury. See, *e. g., Barry* v. *Edmunds,* 116 U. S. 550, 565 (1886) ("[I]t is the peculiar function of the jury" to set the amount of punitive damages); *Day* v. *Woodworth,* 13 How. 363, 371 (1852) (punitive damages should be "left to the discretion of the jury"). They do not, however, indicate that the amount of punitive damages imposed by the jury is itself a "fact" within the meaning of the Seventh Amendment's Reexamination Clause. See *Gasperini* v. *Center for Humanities, Inc.,* 518 U. S. 415, 432 (1996) (distinguishing between the "Trial by Jury" Clause, which "bears . . . on the allocation of trial functions between judge and jury," and the "Reexamination" Clause, which "controls the allocation of authority to review verdicts"); see also *id.,* at 447–448 (STEVENS, J., dissenting) (same).

In any event, punitive damages have evolved somewhat since the time of respondent's sources. Until well into the 19th century, punitive damages frequently operated to compensate for intangible injuries, compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time. See *Haslip,* 499 U. S., at 61 (O'CONNOR, J., dissenting); see also Note, Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517, 520 (1957) (observing a "vacillation" in the 19th-century cases between "compensatory" and "punitive" theories of "exemplary damages"). As the types of compensatory damages available to plaintiffs have broadened, see, *e. g.,* 1 J. Nates, C. Kimball, D. Axelrod, & R. Goldstein, Damages in Tort Actions §3.01[3][a] (2000) (pain and suffering are generally available as species of compensatory damages), the theory behind punitive damages has shifted toward a more purely punitive (and therefore less factual) understanding. Cf. Note, 70 Harv. L. Rev., at 520 (noting a historical shift away from a compensatory—and toward a more purely punitive—conception of punitive damages).

(1998) (in order to obtain optimal deterrence, "punitive damages should equal the harm multiplied by . . . the ratio of the injurer's chance of escaping liability to his chance of being found liable"); see also *Ciraolo* v. *New York*, 216 F. 3d 236, 244–245 (CA2 2000) (Calabresi, J., concurring). "The efficient deterrence theory thus regards punitive damages as merely an augmentation of compensatory damages designed to achieve economic efficiency." Galanter & Luban, Poetic Justice: Punitive Damages and Legal Pluralism, 42 Am. U. L. Rev. 1393, 1449 (1993).

However attractive such an approach to punitive damages might be as an abstract policy matter, it is clear that juries do not normally engage in such a finely tuned exercise of deterrence calibration when awarding punitive damages. See Sunstein, Schkade, & Kahneman, Do People Want Optimal Deterrence?, 29 J. Legal Studies 237, 240 (2000). After all, deterrence is not the only purpose served by punitive damages. See *supra*, at 432. And there is no dispute that, in this case, deterrence was but one of four concerns the jury was instructed to consider when setting the amount of punitive damages.[12] Moreover, it is not at all obvious that even the *deterrent* function of punitive damages can be served *only* by economically "optimal deterrence." "[C]itizens and legislators may rightly insist that they are willing to tolerate some loss in economic efficiency in order to deter what they consider morally offensive conduct, albeit cost-

---

[12] The jury was instructed to consider the following factors: (1) "The character of the defendant's conduct that is the subject of Leatherman's unfair competition claims"; (2) "The defendant's motive"; (3) "The sum of money that would be required to discourage the defendant and others from engaging in such conduct in the future"; and (4) "The defendant's income and assets." App. 14. Although the jury's application of these instructions may have depended on specific findings of fact, nothing in our decision today suggests that the Seventh Amendment would permit a court, in reviewing a punitive damages award, to disregard such jury findings. See, *e. g., Gore,* 517 U. S., at 579–580.

beneficial morally offensive conduct; efficiency is just one consideration among many." Galanter & Luban, 42 Am. U. L. Rev., at 1450.[13]

Differences in the institutional competence of trial judges and appellate judges are consistent with our conclusion. In *Gore*, we instructed courts evaluating a punitive damages award's consistency with due process to consider three criteria: (1) the degree or reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U. S., at 574–575. Only with respect to the first *Gore* inquiry do the district courts have a somewhat superior vantage over courts of appeals, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor.[14] Trial courts and appellate courts seem equally capable of analyzing the second factor. And the third *Gore* criterion, which calls for a broad legal comparison, seems more suited to the expertise of appellate courts. Considerations of institutional competence therefore fail to tip the balance in favor of deferential appellate review.

---

[13] We express no opinion on the question whether *Gasperini* would govern—and *de novo* review would be inappropriate—if a State were to adopt a scheme that tied the award of punitive damages more tightly to the jury's finding of compensatory damages. This might be the case, for example, if the State's scheme constrained a jury to award only the exact amount of punitive damages it determined was necessary to obtain economically optimal deterrence or if it defined punitive damages as a multiple of compensatory damages (*e. g.*, treble damages).

[14] While we have determined that the Court of Appeals must review the District Court's application of the *Gore* test *de novo*, it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous. See *United States* v. *Bajakajian*, 524 U. S. 321, 336–337, n. 10 (1998).

## IV

It is possible that the standard of review applied by the Court of Appeals will affect the result of the *Gore* analysis in only a relatively small number of cases. See Brief for Respondent 46–48; Brief for Association of American Railroads as *Amicus Curiae* 18; see also *Gasperini*, 518 U. S., at 448 (STEVENS, J., dissenting). Nonetheless, it does seem likely that in this case a thorough, independent review of the District Court's rejection of petitioner's due process objections to the punitive damages award might well have led the Court of Appeals to reach a different result. Indeed, our own consideration of each of the three *Gore* factors reveals a series of questionable conclusions by the District Court that may not survive *de novo* review.

When the jury assessed the reprehensibility of Cooper's misconduct, it was guided by instructions that characterized the deliberate copying of the PST as wrongful. The jury's selection of a penalty to deter wrongful conduct may, therefore, have been influenced by an intent to deter Cooper from engaging in such copying in the future. Similarly, the District Court's belief that Cooper acted unlawfully in deliberately copying the PST design might have influenced its consideration of the first *Gore* factor. See App. to Pet. for Cert. 23a. But, as the Court of Appeals correctly held, such copying of the functional features of an unpatented product is lawful. See *TrafFix Devices, Inc.* v. *Marketing Displays, Inc., ante,* p. 23. The Court of Appeals recognized that the District Court's award of attorney's fees could not be supported if based on the premise that the copying was unlawful, but it did not consider whether that improper predicate might also have undermined the basis for the jury's large punitive damages award.

In evaluating the second *Gore* factor, the ratio between the size of the award of punitive damages and the harm caused by Cooper's tortious conduct, the District Court

might have been influenced by respondent's submission that it was not the actual injury—which the jury assessed at $50,000—that was relevant, but rather "the potential harm Leatherman would have suffered had Cooper succeeded in its wrongful conduct." See Brief for Respondent 7; see also Record Doc. No. 323, p. 23. Respondent calculated that "potential harm" by referring to the fact that Cooper had anticipated "gross profits of approximately $3 million during the first five years of sales." Brief for Respondent 7; see also Record Doc. No. 323, at 23. Even if that estimate were correct, however, it would be unrealistic to assume that all of Cooper's sales of the ToolZall would have been attributable to its misconduct in using a photograph of a modified PST in its initial advertising materials. As the Court of Appeals pointed out, the picture of the PST did not misrepresent the features of the original ToolZall and could not have deceived potential customers in any significant way. Its use was wrongful because it enabled Cooper to expedite the promotion of its tool, but that wrongdoing surely could not be treated as the principal cause of Cooper's entire sales volume for a 5-year period.

With respect to the third *Gore* factor, respondent argues that Cooper would have been subject to a comparable sanction under Oregon's Unlawful Trade Practices Act. Brief for Respondent 49. In a suit brought by a State under that Act, a civil penalty of up to $25,000 per violation may be assessed. Ore. Rev. Stat. § 646.642(3) (1997). In respondent's view, *each* of the thousands of pieces of promotional material containing a picture of the PST that Cooper distributed warranted the maximum fine. Brief for Respondent 49. Petitioner, on the other hand, argues that its preparation of a single "mock-up" for use in a single distribution would have been viewed as a single violation under the state statute. Reply Brief for Petitioner 2–3. The Court of Appeals expressed no opinion on this dispute. It did, however, observe that the unfairness in Cooper's use of the picture

apparently had nothing to do with misleading customers but was related to its inability to obtain a "mock-up" quickly and cheaply. App. to Pet. for Cert. 3a. This observation is more consistent with the single-violation theory than with the notion that the statutory violation would have been sanctioned with a multimillion dollar fine.

We have made these comments on issues raised by application of the three *Gore* guidelines to the facts of this case, not to prejudge the answer to the constitutional question, but rather to illustrate why we are persuaded that the Court of Appeals' answer to that question may depend upon the standard of review. The *de novo* standard should govern its decision. Because the Court of Appeals applied a less demanding standard in this case, we vacate the judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring.

I continue to believe that the Constitution does not constrain the size of punitive damages awards. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 599 (1996) (SCALIA, J., joined by THOMAS, J., dissenting). For this reason, given the opportunity, I would vote to overrule *BMW.* This case, however, does not present such an opportunity. The only issue before us today is what standard should be used to review a trial court's ruling on a *BMW* challenge. Because I agree with the Court's resolution of that issue, I join the opinion of the Court.

JUSTICE SCALIA, concurring in the judgment.

I was (and remain) of the view that excessive punitive damages do not violate the Due Process Clause; but the Court held otherwise. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559 (1996); *id.,* at 598 (SCALIA, J., dissenting). And I was of the view that we should review for abuse

of discretion (rather than *de novo*) fact-bound constitutional issues which, in their resistance to meaningful generalization, resemble the question of excessiveness of punitive damages—namely, whether there exists reasonable suspicion for a stop and probable cause for a search; but the Court held otherwise. See *Ornelas* v. *United States*, 517 U. S. 690 (1996); *id.*, at 700 (SCALIA, J., dissenting). Finally, in a case in which I joined a dissent that made it unnecessary for me to reach the issue, the Court categorically stated that "the question whether a fine is constitutionally excessive calls for . . . *de novo* review." *United States* v. *Bajakajian*, 524 U. S. 321, 336–337, n. 10 (1998); see *id.*, at 344 (KENNEDY, J., joined by REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., dissenting). Given these precedents, I agree that *de novo* review of the question of excessive punitive damages best accords with our jurisprudence. Accordingly, I concur in the judgment of the Court.

JUSTICE GINSBURG, dissenting.

In *Gasperini* v. *Center for Humanities, Inc.*, 518 U. S. 415 (1996), we held that appellate review of a federal trial court's refusal to set aside a jury verdict as excessive is reconcilable with the Seventh Amendment if "appellate control [is] limited to review for 'abuse of discretion.'" *Id.*, at 419. *Gasperini* was a diversity action in which the defendant had challenged a compensatory damages award as excessive under New York law. The reasoning of that case applies as well to an action challenging a punitive damages award as excessive under the Constitution. I would hold, therefore, that the proper standard of appellate oversight is not *de novo* review, as the Court today concludes, but review for abuse of discretion.

"An essential characteristic of [the federal court] system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amend-

ment, assigns the decisions of disputed questions of fact to the jury." *Id.*, at 432 (citing *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525, 537 (1958)). The Seventh Amendment provides: "In Suits at common law . . . the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." In *Gasperini*, we observed that although trial courts traditionally had broad authority at common law to set aside jury verdicts and to grant new trials, 518 U. S., at 432–433, "appellate review of a federal trial court's denial of a motion to set aside a jury's verdict as excessive is a relatively late, and less secure, development," *id.*, at 434. We ultimately concluded that the Seventh Amendment does not preclude such appellate review, *id.*, at 436, but explained that "[w]ithin the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of [an excessiveness standard]," *id.*, at 438. "Trial judges have the unique opportunity to consider the evidence in the living courtroom context," we said, "while appellate judges see only the cold paper record." *Ibid.* (citations and internal quotation marks omitted). "If [courts of appeals] reverse, it must be because of an abuse of discretion. . . . The very nature of the problem counsels restraint. . . . [Appellate courts] must give the benefit of every doubt to the judgment of the trial judge." *Id.*, at 438–439 (internal quotation marks omitted) (citing *Dagnello* v. *Long Island R. Co.*, 289 F. 2d 797, 806 (CA2 1961)).

Although *Gasperini* involved compensatory damages, I see no reason why its logic should be abandoned when punitive damages are alleged to be excessive. At common law, as our longstanding decisions reiterate, the task of determining the amount of punitive damages "has [always been] left to the discretion of the jury." *Day* v. *Woodworth*, 13 How. 363, 371 (1852); see *Barry* v. *Edmunds*, 116 U. S. 550, 565 (1886)

("[N]othing is better settled than that . . . it is the peculiar function of the jury to determine the amount [of punitive damages] by their verdict."). The commitment of this function to the jury, we have explained, reflects the historical understanding that "the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case." *Day*, 13 How., at 371. The relevant factors include "the conduct and motives of the defendant" and whether, "in committing the wrong complained of, he acted recklessly, or wilfully and maliciously, with a design to oppress and injure the plaintiff." 1 J. Sutherland, Law of Damages 720 (1882). Such inquiry, the Court acknowledges, "is a fact-sensitive undertaking." *Ante*, at 438, n. 11.

The Court nevertheless today asserts that a "jury's award of punitive damages does not constitute a finding of 'fact'" within the meaning of the Seventh Amendment. *Ante*, at 437. An ultimate award of punitive damages, it is true, involves more than the resolution of matters of historical or predictive fact. See *ibid.* (citing *Gasperini*, 518 U. S., at 459 (SCALIA, J., dissenting)). But there can be no question that a jury's verdict on punitive damages is fundamentally dependent on determinations we characterize as factfindings— *e. g.*, the extent of harm or potential harm caused by the defendant's misconduct, whether the defendant acted in good faith, whether the misconduct was an individual instance or part of a broader pattern, whether the defendant behaved negligently, recklessly, or maliciously. Punitive damages are thus not "[u]nlike the measure of actual damages suffered," *ante*, at 437 (citation and internal quotation marks omitted), in cases of intangible, noneconomic injury. One million dollars' worth of pain and suffering does not exist as a "fact" in the world any more or less than one million dollars' worth of moral outrage. Both derive their meaning from a set of underlying facts as determined by a jury. If one exercise in quantification is properly regarded as factfinding, see *St. Louis, I. M. & S. R. Co.* v. *Craft*, 237

U. S. 648, 661 (1915) (compensation for pain and suffering "involves only a question of fact"), it seems to me the other should be so regarded as well.

In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), we approved application of an abuse-of-discretion standard for appellate review of a district court's ruling on a motion to set aside a punitive damages award as excessive. See *id.*, at 279. *Browning-Ferris* reserved the question whether even such deferential appellate review might run afoul of the Seventh Amendment. At that time (*i. e.*, pre-*Gasperini*), the Court "ha[d] never held expressly that the Seventh Amendment allows appellate review of a district court's denial of a motion to set aside an award as excessive." 492 U. S., at 279, n. 25. We found it unnecessary to reach the Seventh Amendment question in *Browning-Ferris* because the jury verdict there survived lower court review intact. *Id.*, at 279, n. 25, 280. *Browning-Ferris*, in short, signaled our recognition that appellate review of punitive damages, if permissible at all, would involve *at most* abuse-of-discretion review. "[P]articularly . . . because the federal courts operate under the strictures of the Seventh Amendment," we were "reluctant to stray too far from traditional common-law standards, or to take steps which ultimately might interfere with the proper role of the jury." *Id.*, at 280, n. 26.

The Court finds no incompatibility between this case and *Browning-Ferris*, observing that *Browning-Ferris* presented for our review an excessiveness challenge resting solely on state law, not on the Constitution. See *ante*, at 433, and n. 7. It is unclear to me why this distinction should make a difference. Of the three guideposts *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559 (1996), established for assessing constitutional excessiveness, two were derived from common-law standards that typically inform state law. See *id.*, at 575, n. 24 ("The principle that punishment should fit the crime is deeply rooted and frequently repeated in

common-law jurisprudence." (citation and internal quotation marks omitted)); *id.*, at 580 ("The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree."). The third guidepost—comparability of sanctions for comparable misconduct—is not similarly rooted in common law, nor is it similarly factbound. As the Court states, "the third *Gore* criterion . . . calls for a broad legal comparison." *Ante*, at 440. But to the extent the inquiry is "legal" in character, there is little difference between review *de novo* and review for abuse of discretion. Cf. *Gasperini*, 518 U. S., at 448 (STEVENS, J., dissenting) ("[I]t is a familiar . . . maxim that deems an error of law an abuse of discretion.").[1]

Apart from "Seventh Amendment constraints," an abuse-of-discretion standard also makes sense for "practical reasons." *Id.*, at 438. With respect to the first *Gore* inquiry (*i. e.*, reprehensibility of the defendant's conduct), district courts have an undeniably superior vantage over courts of appeals. As earlier noted, *supra*, at 445, district courts view the evidence not on a "cold paper record," but "in the living courtroom context," *Gasperini*, 518 U. S., at 438. They can assess from the best seats the vital matter of witness credibility. And "it of course remains true that [a]

---

[1] Appellate courts, following our instruction, apply *de novo* review to trial court determinations of reasonable suspicion, probable cause, and excessiveness of fines. See *ante*, at 435–436 (citing *United States* v. *Bajakajian*, 524 U. S. 321, 336–337, n. 10 (1998), and *Ornelas* v. *United States*, 517 U. S. 690, 696–698 (1996)). But such determinations typically are made without jury involvement, see, *e. g.*, *Bajakajian*, 524 U. S., at 325–326; *Ornelas*, 517 U. S., at 694, and surely do not implicate the Seventh Amendment. Moreover, although *Bajakajian* said "the question whether a [criminal] fine is constitutionally excessive calls for . . . *de novo* review," 524 U. S., at 336–337, n. 10, *Bajakajian* did not disturb our holding in *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), that the "Excessive Fines Clause does not apply to awards of punitive damages in [civil] cases between private parties," *id.*, at 260.

Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous." *Ante,* at 440, n. 14.[2]

The Court recognizes that district courts have the edge on the first *Gore* factor, *ante,* at 440, but goes on to say that "[t]rial courts and appellate courts seem equally capable of analyzing the second *[Gore]* factor" (*i. e.,* whether punitive damages bear a reasonable relationship to the actual harm inflicted), *ibid.* Only "the third *Gore* criterion [*i. e.,* intrajurisdictional and interjurisdictional comparisons] . . . seems more suited to the expertise of appellate courts." *Ibid.*

To the extent the second factor requires a determination of "the actual harm inflicted on the plaintiff," *Gore,* 517 U. S., at 580, district courts may be better positioned to conduct the inquiry, especially in cases of intangible injury. I can demur to the Court's assessment of relative institutional strengths, however, for even accepting that assessment, I would disagree with the Court's conclusion that "[c]onsiderations of institutional competence . . . fail to tip the balance in favor of deferential appellate review," *ante,* at 440. *Gore* itself assigned particular importance to the first inquiry, characterizing "degree of reprehensibility" as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." 517 U. S., at 575. District courts, as just noted, *supra,* at 448 and this page, have a superior vantage over courts of appeals in conducting that fact-intensive inquiry. Therefore, in the typical case envisioned by *Gore,* where reasonableness is primarily tied to reprehensibility, an appellate court should have infrequent occasion to reverse.

This observation, I readily acknowledge, suggests that the practical difference between the Court's approach and

---

[2] An appellate court might be at a loss to accord such deference to jury findings of fact absent trial court employment of either a special verdict or a general verdict accompanied by written interrogatories. See Fed. Rule Civ. Proc. 49.

my own is not large. An abuse-of-discretion standard, as I see it, hews more closely to "the strictures of the Seventh Amendment," *Browning-Ferris*, 492 U. S., at 280, n. 26. The Court's *de novo* standard is more complex. It requires lower courts to distinguish between ordinary common-law excessiveness and constitutional excessiveness, *ante*, at 433, and to separate out factfindings that qualify for "clearly erroneous" review, *ante*, at 440, n. 14. See also *ante*, at 440, n. 13 (suggesting abuse-of-discretion review might be in order "if a State were to adopt a scheme that tied the award of punitive damages more tightly to the jury's finding of compensatory damages"). The Court's approach will be challenging to administer. Complex as it is, I suspect that approach and mine will yield different outcomes in few cases.

The Ninth Circuit, I conclude, properly identified abuse of discretion as the appropriate standard in reviewing the District Court's determination that the punitive damages awarded against Cooper were not grossly excessive. For the Seventh Amendment and practical reasons stated, I would affirm the judgment of the Court of Appeals.