

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00330-CV

DAVID NEAL DUNCAN, APPELLANT

V.

GARY F. PRESCOTT, APPELLEE

On Appeal from the 251st District Court
Randall County, Texas
Trial Court No. 60,787-C, Honorable Don Emerson, Presiding

October 11, 2013

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

David Neal Duncan appeals the verdict of a jury that resulted in a judgment against Duncan and in favor of Gary F. Prescott for the sum of $1,650 in compensatory damages and $85,000 in exemplary damages. Through two issues, Duncan contends that exemplary damages were so clearly excessive as to be a denial of due process and the jury verdict awarding exemplary damages was not unanimous. We will suggest a remittitur and affirm the judgment of the trial court as modified.

Factual and Procedural Background

The basic facts that are involved in the case are not really subject to much dispute. On August 19, 2008, Duncan's then-wife, Taylor, and his 18-month-old daughter were shopping at Petsmart in Amarillo, Texas. Also shopping at Petsmart on that day was Prescott. Eventually, Taylor and the daughter ended up in the checkout line in front of Prescott. Apparently, there were several people in the checkout line in front of Taylor and, while waiting in the line, her daughter kept taking things off nearby shelves and throwing them on the floor. The child's activities disturbed Prescott, as did the failure of Taylor to attempt to stop her. Eventually, Prescott said something to Taylor about controlling her child. Taylor advised Prescott to mind his own business and not to talk to her about the child. This led Prescott to utter the phrase that led to the physical confrontation. Prescott stated to Taylor that, if she did not control the child, the child would grow up to be a "whore" just like Taylor.

After uttering this sentence, Prescott left the checkout line and went to the rear of the store to pick up a large bag of cat litter. Taylor was very upset and called her husband, Duncan, to advise him what had occurred. Testimony about what Taylor told her husband was somewhat in conflict; however, the Petsmart cashier who was checking Taylor out overheard Taylor tell Duncan he needed to come and beat Prescott up. Duncan was shopping at the Academy store, nearly one and one-half mile away.

Duncan arrived at Petsmart within a matter of minutes. He immediately went toward the back of the store in search of Prescott. According to the testimony, Taylor was with Duncan and pointed out Prescott by saying, "That's him." While Prescott, with

his back facing Duncan, was putting a large bag of cat litter in a shopping cart, Duncan struck Prescott in the back of the head. Prescott fell to the ground and tried to cover his head up while Duncan continued to throw a punch at his head. Duncan got astride Prescott, rolled him over and sat on him while continuing to throw a couple of punches at Prescott's head. The record shows that it was not until Duncan realized that people were telling him the police had been called that he stopped the assault of Prescott and left the store.

Duncan was subsequently indicted for the felony offense of aggravated assault with a deadly weapon; specifically, his hands in the manner of their use or intended use were designated as the deadly weapon. Duncan entered into a plea bargain on the matter and, after entering a plea of guilty, was placed on deferred adjudication for 10 years.

Prescott initially refused medical attention at the scene. However, a couple of days later he presented at the ER at Northwest Texas Hospital with complaints of continued headaches. Tests were run on Prescott at that time. After having some tests performed, Prescott left the hospital before the results were fully known. Prescott testified that he asked if he was OK and when told he was, left the hospital after getting assurances that they would call him if anything was wrong. Prescott's medical bills were presented by an affidavit from the custodian of the medical records at Northwest Texas Hospital and were in the amount of $650. Prescott testified to continue to have occasional headaches plus bouts of anxiety from time to time.

After hearing the evidence and argument of counsel, the jury returned a verdict that found that Duncan had committed an assault against Prescott. Further, the jury found that Prescott had been damaged in the sum of $1,000 for physical pain and mental anguish in the past and had suffered reasonable and necessary medical expenses of $650 in the past. The jury also found that by clear and convincing evidence that the harm to Prescott resulted from malice and awarded Prescott $85,000 in exemplary damages.

After receiving the jury's answers to the questions asked, the trial court entered judgment based upon the answers. Thereafter, Duncan filed a motion for a remittitur and new trial. Duncan's motion was overruled by operation of law and this appeal followed.

Duncan now contends that the award of exemplary damages was so excessive as to amount to a denial of due process. In his second issue, Duncan contends that the record reflects that the jury verdict was not unanimous regarding liability and, therefore, cannot sustain the judgment for exemplary damages. We will suggest a remittitur as hereinafter set forth and, in all other respects, affirm the trial court's judgment.

## Jury Verdict

We choose to address the question raised by Duncan regarding the propriety of the jury verdict first. Briefly, Duncan contends that the verdict received by the trial court is defective because the same was not the result of jury unanimity.[1] For this

---

[1] Prescott raises the issue of whether either of Duncan's complaints regarding jury unanimity were properly preserved. We need not address this question because of our disposition of the matter.

4

proposition, Duncan cites the Court to Rule 292(b) of the Texas Rules of Civil Procedure and Section 41.003 of the Texas Civil Practices and Remedies Code. Each provision cited does, in fact, require that a jury's verdict assessing exemplary damages must be the result of jury unanimity on the question of liability and the amount of those damages. See TEX. R. CIV. P. 292(b); TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (West Supp. 2012).

However, a close reading of the record and review of the clerk's record supports the fact that the jury was unanimous in its verdict on liability and amount of exemplary damages. The confusion came about from how the requirement for jury unanimity was applied to Question 2. When the jury first returned a verdict on liability and damages to the courtroom, the verdict form as to medical expenses suffered by Prescott in the past had only the notation "out of pocket medical expenses." The trial court sent the jury back to deliberate and come out with a dollars and cents notation for that answer. Thereafter, the jury returned with the notation of "$650" written on the form. The presiding juror had originally signed the verdict form indicating jury unanimity on all questions. When the jury returned to the courtroom with a dollar amount written in for Question 2, the presiding juror, when questioned by the trial court, advised that they were no longer unanimous as to the amount of damages. The trial court then interlineated lines for the jurors who found for questions one and two to sign and a separate signature for the presiding juror to indicate juror unanimity for the liability question, Question 3, and instructed them to return to the jury room to affix the signatures to the appropriate form. Upon returning to the courtroom, the jury had verdict forms signed by ten of the jurors that applied to answers to Questions 1 and 2.

5

The presiding juror signed on the line that applied to Question 3, as indicated by the trial court's written instruction.

The liability question, for purposes of this issue, was Question 3. Question 3 contained an instruction that to answer "yes" to this question the answer must be unanimous and that the jury could answer "no" to the question on the vote of ten jurors. The question asked is, "Do you find by clear and convincing evidence that the harm to Gary Prescott resulted from malice?" The question then gave the correct definitions of "clear and convincing evidence" and "malice." The jury answered "yes" to the question. As stated above, "malice," as defined by the trial court, was the liability question that required the unanimous jury answer in the case before the Court. See TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(2).

The record further reflects that the jury's answer to Question 4, the exemplary damages question, occurred the following day. In the instructions that accompanied this question, the trial court set forth the requirement that the jury's answer was to be unanimous. The record reflects that the verdict form was signed by the presiding juror, indicating jury unanimity.

Because the record clearly demonstrates that the jury's answers to Questions 3 and 4, those requiring unanimity, were in fact unanimous, we overrule Duncan's second issue.

Exemplary Damages

We now turn our attention to Duncan's first issue, wherein he contends that the amount of the exemplary damages awarded to Prescott is so excessive as to amount to

6

a violation of his federal constitutional right to due process.  See U.S. CONST. amend. XIV, § 1.

The United States Supreme Court has directed that we must review the award of exemplary damages pursuant to three guideposts: 1) the degree of reprehensibility of Duncan's misconduct; 2) the disparity between the actual or potential harm suffered by Prescott and the exemplary damages awarded; and 3) the difference between the exemplary damages awarded by the jury and the civil penalties authorized or imposed in a comparable case.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).  Our review of these guideposts, as applied by the trial court, is further directed to be *de novo.*  See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).  Our review is further guided by our Texas Supreme Court who has stated that the constitutionality of exemplary damages is a legal question for the court.  See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 307 (Tex. 2006) (citing Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43, 45 (Tex. 1998)).

Duncan's position regarding the amount of exemplary damages is very simple and straight forward.  Duncan posits that the award of exemplary damages, as compared to what the jury found as actual damages, results in a ratio of 51.5:1, which is significantly greater than the 4:1 ratio that the Texas Supreme Court has historically stated as being "close to the line" for constitutional impropriety.  See Bennett v. Reynolds, 315 S.W.3d 867, 873 (Tex. 2010).  However, as the United States Supreme Court has on several occasions noted, "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally

7

unacceptable that would fit every case." See TXO Prod. Corp. v. Alliance Res., 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)).

We therefore turn to the guideposts as formulated by the United States Supreme Court and adopted by the Texas Supreme Court. See Gore, 517 U.S. at 575; Bennett, 315 S.W.3d at 873. The first consideration is the degree of reprehensibility of Duncan's conduct. In making this determination, the United States Supreme Court has set forth five nonexclusive factors to consider. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct 1513, 155 L.Ed.2d 585 (2003). First, the harm visited on Prescott by Duncan was physical harm and not economic harm. Id.; Bennett, 315 S.W.3d at 874. The record reflects that Duncan attacked a man some 27[2] years older than himself from behind. This fact alone pushes the reprehensibility factor very high. Second, we consider whether the tortious conduct showed "an indifference to or a reckless disregard for the health or safety of others." Campbell, 538 U.S. at 419; Bennett, 315 S.W.3d at 874. Further, the record reflects that Duncan showed no propensity to cease the assault until the fact that the police had been called was made very clear to him. This action shows indifference by Duncan as to the health or safety of others, or at least a reckless disregard for it. The third and fourth factors, respectively, the financial vulnerability of the target and whether the conduct involved—the assault— was a repeated event, are not applicable to our facts. See Campbell, 538 U.S. at 419. The last factor, whether the harm resulted from "intentional malice" as opposed to accident, is very present. Despite how hard Duncan tries to portray the assault as

_____

[2] The medical records introduced into the evidence reflect that Prescott was 65 years old. Duncan testified that he was 38 years old on the date of the assault.

"either protecting the honor of his then-wife" or "outrage" at the incendiary words used by Prescott, the fact remains that Duncan drove nearly a mile and a half from Academy to Petsmart before attacking Prescott. Thus, the assault on Prescott begins to take on the visage of premeditation, as opposed to heat of passion. This fact and the violence of an attack from behind strongly support the finding of malice. At the end of the day, Duncan's conduct was simply extremely reprehensible.

Looking at the second guidepost, "the disparity between the actual or potential harm suffered by Prescott and the exemplary damages award," we are called to look at the ratio between compensatory damages and the exemplary damages. See id. at 418; Bennett, 315 S.W.3d at 873. However, before we approach the ratio present in this case, matters need to be considered.

First, the question of the actual damages versus the potential for substantially greater damages must be addressed. Prescott suffered actual damages, according to the jury's verdict, of $1,650; however, the testimony regarding the assault paints a significantly different picture about the severity of the assault. To reiterate, Duncan attacked Prescott from the rear with a blow to the head. According to one witness, after Prescott fell to the floor, Duncan rolled him over so that Duncan was astride his back and continued to punch. Further, witnesses said Duncan was banging Prescott's head against a concrete floor. That Prescott did not suffer much more significant injuries was simply due to good fortune and not because of anything Duncan did or did not do.

Second, we cannot agree with Duncan's attempt to characterize his conduct, during his testimony, and in his briefs, as some sort of heat-of-passion moment. The

9

record is rather clear on the fact that Duncan was not physically present when Prescott uttered the untoward and uncalled for comment. Duncan got the phone call and drove from the Academy store to the Petsmart location, a distance of 1.4 miles. Upon arrival, Duncan went to the back of the store, his then-wife pointed out Prescott, and Duncan assaulted him. In the period between the phone call and the assault, Duncan had enough time for at least some momentary reflection on his chosen course of conduct, yet, he did not chose to consider the ramifications of his conduct.

Realizing that there is no set of mathematical ratios that fits all circumstances and, upon reflecting on the facts within the second guidepost, we are left with a couple of additional considerations. See TXO, 509 U.S. at 458. The initial consideration is whether there is a reasonable relationship between the exemplary damages award and the harm likely to result from the conduct of Duncan as well as the harm already actually suffered by Prescott. See Gore, 517 U.S. at 581. Additionally, we note that a particularly egregious act that results in only small damages may support a larger award of exemplary damages and still comport with due process requirements. See Campbell, 538 U.S. at 425. So too has the Texas Supreme Court held in the Bennett case. Bennett, 315 S.W.3d at 879.

However, before we finally answer the question of whether this particular award of exemplary damages comports with our due process requirements, we need to address the third guidepost set forth in Gore, that is, the difference between the exemplary damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Campbell, 538 U.S. at 418. In our case, there are no comparable civil penalties because this was a criminal assault. We are authorized to consider

10

criminal penalties that could be imposed because this is indicative of the seriousness with which the State views the wrongful conduct. See id. at 428. To the charges stemming from this event, Duncan entered a plea of guilty to the offense of aggravated assault with a deadly weapon. See TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011). Aggravated assault with a deadly weapon is a second-degree felony and is punishable by confinement for a term of not more than 20 years or less than 2 years in the Institutional Division of the Texas Department of Criminal Justice, and an optional fine of up to $10,000. See id. §§ 12.33, 22.02(b). However, we are warned that, in referring to the possible criminal penalties, we must take "great care" to avoid using the civil process to impose criminal penalties that can be properly imposed only after the heightened standards of proof of criminal prosecutions have been observed. See Campbell, 538 U.S.at 428.

In our case, the record supports our consideration of the criminal penalty because Duncan has entered a plea of guilty to the offense. For purpose of our analysis, his guilty plea alleviates to some degree the concerns voiced in Campbell regarding the heightened standards of proof in a criminal matter. See id. Accordingly, we find support for a measure of exemplary damages in the legislative determination that Duncan's type of conduct is worthy of punishment as a second-degree felony.

Based upon our consideration of the guideposts set forth in Gore, we find that the exemplary damages awarded do go beyond the constitutional limits. Specifically, we note that a ratio of 51.5:1 is excessive under the applicable authority of our Texas Supreme Court. See Bennett, 315 S.W.3d at 882-83 (holding that, under the facts of the case, a ratio of 4:1 was "a stretch"); Tony Gullo Motors, 212 S.W.3d at 310 (holding

that an award 5 to 10 times more than the comparable civil penalty was constitutionally infirm).

However, we feel no hesitation is finding that award of exemplary damages equal to the criminal fine applicable in this matter—$10,000—would pass the constitutional due process test.

Conclusion

We overrule Duncan's second issue. However, we sustain his first issue relating to the exemplary damages and suggest a remittitur. In accordance with Rule 46.3 of the Texas Rules of Appellate Procedure, if Prescott files with this Court, within fifteen days of the date of this opinion, a remittitur of $75,000 from the award for exemplary damages, the trial court's judgment will be reformed as to exemplary damages and affirmed. See TEX. R. APP. P. 46.3. If the suggested remittitur is not timely filed, the trial court's judgment will be reversed with respect to exemplary damages, and this cause will be remanded to the trial court for a new trial on all issues.


Mackey K. Hancock
Justice