Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,599-CA
No. 55,600-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MONICA D. DURAN                                      Plaintiff-Appellee

versus

ALLMERICA FINANCIAL                            Defendants-Appellants
BENEFIT INSURANCE
COMPANY, THE MER ROUGE
STATE BANK, LOUISIANA
FARM BUREAU MUTUAL
INSURANCE COMPANY AND
GERALD FARRAR

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Morehouse, Louisiana
Trial Court No. 2017-314

Honorable Alvin R. Sharp, Judge

* * * * *

PHELPS DUNBAR, LLP                              Counsel for Appellant,
By: Kim M. Boyle                                       Gerald Farrar
    Jeremy T. Grabill

LAW OFFICES OF MASON L. OSWALT
By: Mason L. Oswalt

LUNN IRION LAW FIRM, LLC
By: Gerald M. Johnson, Jr.

SEABAUGH & SEPULVADO, LLC                    Counsel for Appellant,
By:  Alan T. Seabaugh                        Allmerica Financial
     Michael C. Melerine                     Benefit Insurance
     Paul L. Wood                            Company

NELSON, ZENTNER, SARTOR
& SNELLINGS
By:  David H. Nelson
     Fred W. Sartor, Jr.

THE DOWNS LAW FIRM APC                       Counsel for Appellee
By: E. Ross Downs, Jr.
    E. Ross Downs, III
    Hayden S. Downs
    Emily W. Downs

* * * * *

Before STONE, THOMPSON, and HUNTER, JJ.

**THOMPSON, J.**

Gerald Farrar's blood alcohol content was four times the legal limit when he hit the side rail of a bridge and the right front wheel of his vehicle was torn off. The wheel came to rest in the roadway and caused a second accident when a vehicle came upon it, struck it, and then slammed into a guardrail, seriously injuring the driver. During the five-week trial that followed, the jury was presented with information regarding Farrar's history of drinking and driving and his attempt to leave the scene of the accident in his severely damaged vehicle. The evidence at trial also revealed that he failed a field sobriety test and refused a breathalyzer. He consistently denied consuming any or very much alcohol the night of the accident, until he was finally confronted at trial with the evidence of his blood alcohol content from a blood draw taken at the hospital the night of the accident. The jury awarded the injured driver $843,155 in past, present, and future medical expenses and damages for her injuries, and, finding Farrar's wanton and reckless conduct to be the cause of her injuries, imposed exemplary damages against him in the amount of $3,000,000 (a ratio of approximately 3.56 to 1 to the jury award). Farrar now appeals the exemplary damage award, arguing it is grossly excessive, in amount and as a ratio to the special and general damages award, and, as such, constitutes a violation of the Due Process Clause. Farrar asks this court to reduce or eliminate the exemplary damage award. Finding Farrar's conduct to be obscenely reprehensible and considering the substantial damage award by the jury, we affirm the exemplary damage assessment by the jury.

## FACTS AND PROCEDURAL HISTORY

On the evening of October 26, 2016, Monica Duran ("Duran"), was driving on U.S. Highway 425 in Morehouse, Parish, Louisiana, when she suddenly came upon a dislodged wheel laying in her lane of travel. Shortly beforehand, that wheel had been torn from the vehicle driven by Gerald Farrar ("Farrar"). U.S. 425 is a two-way roadway with a posted speed limit of 55 miles per hour. Without adequate time to avoid the impact, her vehicle hit the wheel and was forced into the guardrail, then bounced off it, and came to rest. Duran was injured; her passenger was not.

Duran called 911 for assistance, and deputies from the Morehouse Parish Sheriff's Office and a Louisiana State Trooper responded to the scene of the accident. Ambulances eventually transported both Duran and Farrar to the emergency room of St. Francis Medical Center in Monroe, Louisiana. Duran complained of low back pain and was treated for a concussion before being discharged. She was subsequently treated over several months by Dr. Allen Spires (a general practitioner), Dr. Elijah Globke (a chiropractor), and Dr. David Weir (a neurologist) for her low back pain and neurological symptoms. Farrar received treatment for a broken ankle, which required surgery.

Prior to Duran encountering the wheel in the roadway, Farrar had been driving ahead of and in the same direction as her, when he struck the guardrail with such force that the entire front right wheel of his Chevrolet Silverado was torn off. After making impact with the guardrail, Farrar apparently attempted to continue traveling on the remaining three wheels and eventually came to a rest approximately 800 feet farther up the road.

2

In July of 2017, Duran filed suit for her juries, naming Farrar, his employer, Mer Rouge State Bank ("the Bank"), which owned the Chevrolet Silverado Farrar was driving, and its liability insurer, Allmerica Financial Benefit Insurance Company ("Allmerica"). Prior to trial, the Bank was dismissed from the litigation when the trial court granted its motion for summary judgment. In March of 2022, the matter proceeded to a five-week jury trial. At the conclusion of the trial, the jury returned a verdict in favor of Duran in the amount of $843,155, for the following itemized damages:

| | |
|---|---|
| A) Past Medical Expenses | $ 80,000 |
| B) Future Medical Expenses | $ 82,556 |
| C) Past Lost Earnings | $ 478 |
| D) Future Loss of Earnings and/or Earning Capacity | $230,121 |
| E) Past Physical Pain and Suffering | $ 50,000 |
| F) Future Physical Pain and Suffering | $250,000 |
| G) Past Mental Suffering | $ 25,000 |
| H) Future Mental Suffering | $ 50,000 |
| I) Past Loss of Enjoyment of Life | $ 50,000 |
| J) Future loss of Enjoyment of Life | $ 25,000 |
| **TOTAL** | **$843,155** |

The defendants have not appealed the reasonableness of the above awards. What is in dispute, however, is the award by the jury of added exemplary damages in the amount of $3,000,000, based on Farrar's intoxication at the time of the accident being the cause of Duran's injuries, as allowed by La. C.C. Art. 2315.4. The jury verdict form asked the following:

3

> Do you find, more probably than not, that Monica Duran's injuries were caused by Gerald Farrar's wanton or reckless disregard for the rights and safety of others, by Farrar's driving while intoxicated at the time of the accident?

The jurors indicated "Yes" in response to that inquiry. Next, the jurors wrote in **"$3,000,000"** when asked: "Please state an amount in dollars of exemplary damages that you assess against Gerald Farrar, if any."

As Farrar is appealing only the exemplary damage award, the focus of our review will be the testimony and evidence presented to the jury for its consideration in determining if exemplary damages were warranted, and if awarded, whether the award was reasonable under the circumstances.

**The Testimony and Evidence Adduced at Trial**

During trial, there were numerous witnesses testifying about the cause of the accident, the injuries sustained, and treatment provided and recommended for Duran. Sergeant Daniel Jones, a deputy at the Sheriff's Office in Morehouse Parish, testified he was one of the first deputies to respond to the scene of the October 26, 2016 accident (hereinafter "the Accident"). Sgt. Jones testified he observed Farrar's white Chevrolet Silverado on the side of the roadway and a small Toyota blocking the bridge. Jones did not personally contact anyone from the Silverado at the scene. He testified that based on his investigation of the accident scene, Farrar attempted to continue driving the Silverado on three wheels for several hundred feet after he collided with the right-side guard rail.

Patrick Morris,[1] a Louisiana State Police Trooper, also responded to the accident scene. Trooper Morris testified when he arrived on the scene

---

[1] At the time of trial Trooper Morris was patrol deputy in the Sheriff's Office in Richland Parish.

that he started taking photos and spoke to both drivers. He observed that Farrar's vehicle had struck the guardrail of a small bridge going over a ditch and that the front right wheel and tire was in the roadway north of the bridge. Trooper Morris testified that Farrar's vehicle travelled approximately 700-800 feet on three wheels after the impact with the guard rail and that he did not have any doubt that Farrar was hitting the gas while his vehicle only had three wheels. When Trooper Morris spoke to Farrar while at the scene as he was being treated in the ambulance for an injury to his leg, he could smell the odor of alcohol on Farrar's breath. Farrar denied being impaired, admitted only to having a couple of drinks before the accident, and then refused Trooper Morris' request he submit to a breathalyzer test. Trooper Morris did, however, conduct a field sobriety test – the horizontal gauge nystagmus test – which he testified indicated Farrar was impaired at the time of the accident. Trooper Morris placed Farrar under arrest at that point and issued him a summons for DWI; Farrar was then transported to the hospital for medical treatment.

Dr. Christopher John Najberg, a board-certified emergency physician at the St. Francis Downtown Campus, treated Duran in the emergency room after her accident. Though he did not personally treat Farrar in the emergency room, Dr. Najberg did testify regarding the alcohol testing procedure in the St. Francis emergency room where Farrar was treated. Farrar's medical records from the emergency room indicate that a blood draw was performed on him due to a nurse's belief that Farrar was intoxicated; the medical record notes that Farrar's speech was profane,

5

rambling, and slurred. Dr. Najberg testified that Farrar's **BAC of 0.346%**[2] indicates a very high degree of intoxication, and that "[F]or an alcohol level of 0.346 you shouldn't be operating a golf cart even as a video game. That is extremely intoxicated." Dr. Najberg also testified that Farrar having a long-time drinking problem, or being a chronic drinker, would explain how he could remain conscious at such a high blood alcohol level, and that no one can safely operate machinery with a BAC of 0.346%.

James Steven Cox, a board member of Mer Rouge State Bank, testified at trial regarding Farrar's history of possibly abusing alcohol and driving. The record shows that the Bank provided Farrar the vehicle he was driving the night of the Accident. Cox testified that he attended an informal meeting of board members regarding a prior automobile accident of Farrar in 2015 but that he was not aware of Farrar's BAC of 0.346% following the Accident with Duran. Cox confirmed that Farrar continued to earn bonuses because of his performance as the bank president after causing the Accident, but he did not know whether Farrar attended rehab for alcohol abuse after the Accident.

Alex Rankin, also a board member of the Bank, testified at trial. Rankin testified that during a prior board meeting he smelled something that

---

[2] La. R.S. 14:98 provides, in pertinent part:
    A. (1) The crime of operating a vehicle while intoxicated is the operating of any motor vehicle, aircraft, watercraft, vessel, or other means of conveyance when any of the following conditions exist:
        (a) The operator is under the influence of alcoholic beverages.
        (b) The operator's blood alcohol concentration is 0.08 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood.

he thought could be alcohol on Farrar's person. Rankin testified that this board meeting took place sometime in 2015 or 2016, prior to the Accident.

Nancy Lowery, a bank employee at the Bank from 2001 to 2014, testified that in her position as a loan processor, she worked with Farrar processing loans he originated. Lowery testified that she believed Farrar was an alcoholic, based on her own personal experience of her father being an alcoholic. She believed Farrar was under the influence of alcohol while at work. She testified that Farrar frequently had a red face and slurred speech, and that board members regularly attended board meetings with Farrar when he was visibly drunk. Lowery testified that she did not speak to her superiors at the bank about her belief that Farrar was an alcoholic.

Cindy Turner, Farrar's sister, also testified at trial. Like Farrar, Turner was employed by the Bank, and she has been a bank teller there since 2014. Turner testified that Farrar's wife, Holly, had approached her on multiple occasions prior to the Accident with concerns that Farrar was an alcoholic. She denied her brother had a problem with alcohol. Turner testified, with a limited recollection of conversations she had with the superiors at the bank and her sister-in-law, that she did not ever personally see her brother drinking to excess or driving under the influence of alcohol. Turner testified that on the evening of the Accident, she spoke to Farrar on the phone for approximately 15-20 minutes, and that Farrar did not seem drunk to her and was not slurring his words. Turner confirmed she was aware that Farrar received a DWI following the Accident, "because of the things that were released in the news," but she denied she personally knew that her brother was drunk on the night of the accident. Turner testified that

7

she went to the hospital to see Farrar the night of the Accident, but denied observing him use profane or slurred speech to the emergency room personnel, despite contemporaneous medical records reflecting such conduct by Farrar.

The refusal or delay by Farrar in the course of this litigation in admitting and disclosing his level of intoxication at the time of the accident would understandably be a factor for the jury in arriving at its exemplary damage award. To that point, Turner confirmed at trial that her brother told Trooper Morris and hospital personnel that he had **one** drink earlier in the day, and she denied smelling alcohol on him. The results of the blood alcohol test at the hospital, and that of medical personnel familiar with the effects of alcohol in the system, revealed a significantly different reality from that consistently depicted by the testimony of Turner and Farrar regarding Farrar's condition leading up to and immediately following the Accident.

Kelley Adamson, a traffic accident reconstructionist and licensed professional civil engineer in the states of Texas, Louisiana, and Mississippi, testified that he had been doing accident reconstruction for 39 years and estimated he had performed approximately 7000 traffic accident reconstructions in his career. Adamson testified regarding his investigation and the contents of a report he prepared, regarding Farrar's accident scene. Adamson's report provides the following summary of his opinions:

> 1. Based upon my review and analysis, Mr. Farrar (driver of the 2015 Chevrolet Silverado) was traveling northbound on US 425 in a left curve approaching a bridge section. Mr. Farrar failed to maintain his vehicle in the travel lane, traveled to the right and struck the guardrail. The impact caused the right front wheel to be torn off the vehicle. The

wheel came to rest in the northbound lane of US 425. Mr. Farrar's vehicle traveled over 800 feet further to the north, traveling on three wheels, before coming to rest. To travel this distance with the disable vehicle, the driver would have to apply power.

2. Ms. Monica Duran (driver of the 2000 Toyota Tacoma) was traveling northbound on US 425. Her vehicle struck the Silverado's wheel which caused her vehicle to veer to the left and strike the left side guardrail. There is no indication that Ms. Duran was exceeding the posted speed limit.

3. From my training and education in the field of human factors, Ms. Duran would not have been able to identify the black tire/wheel in the roadway until too late to avoid the collision.

Adamson concluded that Farrar's failure to control his vehicle was consistent with being under the influence of alcohol, and that his investigation established that Farrar's tire did not come off or begin to loosen prior to him hitting the guard rail.

Also testifying was Dr. William J. George, a pharmacologist, toxicologist, and professor at Tulane Medical School in New Orleans, Louisiana, who has 50 years of experience in his field and has been recognized as an expert in both pharmacology and toxicology in courts throughout Louisiana and other states. Dr. George testified that he had reviewed Farrar's medical records from St. Francis that showed a BAC of 0.346% in reaching his expert opinion. Dr. George noted that Farrar was approximately **four times the legal limit** of .08% BAC at the time of his accident. Dr. George testified that at this blood alcohol level, an individual would be in a **"stupor stage"** of intoxication and experience extreme confusion and loss of motor function, blurred or double vision, and difficulty staying awake. Dr. George testified that to achieve the 0.346% BAC shown in Farrar's certified emergency room records, Farrar had to have consumed

9

at least 12-15 beers, 12-15 shots of bourbon, or 12-15 glasses of wine at a minimum. Dr. George concluded, in his expert opinion, that Farrar's blood alcohol level was clearly a significant factor in his operation of his motor vehicle and his collision with the right guard rail.

The defendant, Gerald Farrar, testified at the trial. On cross-examination, he admitted that prior to the Accident he would regularly drink and drive in his bank-owned vehicle. He repeatedly denied at trial that he was an alcoholic, but explained that at the time of his accident he had a lot going on in his personal life.[3] The record shows that prior to the Accident, his physician, Dr. Allen Spires, prescribed him Lorazepam 2 mg per day, which he took for anxiety. He admitted that he drank too much on the day and night of the Accident, and that he refused the breathalyzer test from Trooper Morris at the scene because he was "scared." Farrar testified that he was not aware, as testified to by his wife, that she had ever called his coworkers and fellow board members at the bank expressing concerns about his drinking.

Farrar acknowledged a prior accident in his bank-owned vehicle one afternoon in April of 2015, in which the vehicle was totaled when he crashed into a tree. He told the responding officer at the scene that he swerved to

---

[3] Farrar's testified a complicated family situation contributed to his separation from his wife, Holly Farrar, three days before the Accident. Farrar explained his 16-year-old daughter had become pregnant during her sophomore year in high school, and she had given birth to his first grandchild on October 26, 2015. What followed, he testified, was contested litigation regarding the custody and visitation with the child. The day of the Accident, was the child's first birthday, which was to begin a visitation schedule which included overnight stays by the child with his biological father. Farrar attended his grandson's first birthday party being hosted at Farrar and his wife's marital home, and that he began drinking between 12:00 PM and 1:00 PM that day. At around 6:45 PM when the accident occurred, Farrar was driving to stay at this friend's house in Rayville, Louisiana, with plans to leave the next morning to go out of state on a hunting trip.

avoid a wild hog in the road and struck a tree, and that OnStar notified local authorities after the collision. He acknowledged he suffered a gash on his head, that an ambulance did come to the scene, and a paramedic treated him there. Farrar declined a ride with the ambulance to go to the emergency room. The record shows that despite a request from Duran's counsel, no medical records from an ambulance responding to the 2015 accident were ever produced. Farrar did not go to a hospital, but went to the office of his friend, Dr. Allen Spires, to receive stitches to his head. Farrar denied that alcohol was a factor in that accident.

Regarding the Accident, the record shows that throughout litigation with Duran, Farrar steadfastly maintained that he had consumed one or only a few drinks. Specifically, in November of 2017, after suit had been filed, Farrar responded to written interrogatories claiming that he did not consume **any** alcohol prior to the Accident. During his deposition in December of 2017, Farrar testified that he only consumed two ounces of alcohol on the day of the Accident. Finally, at trial, and only **after** his medical records showing his BAC of 0.346% hours after the accident were presented to the jury and introduced in the record, did Farrar finally admit that he did consume more than one alcoholic drink on the date of the Accident. He testified that he drank bourbon and waters, but he did not know the number of drinks he consumed. He testified that he had 20-40 miles to travel on the two-lane road to his hunting camp, after consuming alcohol at his grandson's party that day. Duran's counsel asked:

Q:    And you didn't limit yourself because you have no limit. True?

A:    I messed up.

11

Farrar admitted to being on the phone with his sister, Cindy Turner, for 30-45 minutes prior to the Accident. The record shows that while Duran's vehicle only travelled 20 feet after she hit the guardrail, Farrar's vehicle travelled 880 feet past the point of impact. Farrar could not say whether his foot was on the gas after he collided with the guardrail. He broke his ankle during the Accident, which he testified required surgery a few days later. He did not recall when he first contacted his employer about his accident in his bank-owned truck, but that during a board meeting when he returned from his surgery, he did admit to his fellow board members that he had been cited for a DWI in connection with the Accident. Farrar testified that he was not fired from his job, and he was encouraged by the board to seek help if he needed it for a drinking problem. He denied having a drinking problem, only admitting that he had too much drink the day of the Accident. He testified that he has not had a drink since the accident and expressed remorse for the harm he caused to Duran and to his own family. Farrar testified that he continued to receive pay and bonuses from the bank after the Accident. Farrar denied knowing his BAC was 0.346% following the Accident until trial.

Holly Farrar, Farrar's wife, testified that Farrar's drinking had been a stressor throughout their 23-year marriage. Farrar would drink and drive to and from his hunting property on Higginbotham Road, and she testified she would smell alcohol on him after he returned. In multiple telephone calls from 2013-2014, Holly Farrar testified that she called Turner, Farrar's sister, regarding Farrar's drinking issues.

Regarding the incident where Farrar ran into a tree in 2015, Holly Farrar testified that she arrived to that scene, saw blood coming from his head, and observed the severity of the damage to the bank's vehicle. She testified that instead of the ambulance taking Farrar to the emergency room, she took him to the office of his friend and family physician, Dr. Allen Spires. Dr. Spires testified and confirmed that no blood tests were ordered on this date and there is no record of Farrar's visit or treatment at his office. Shortly after that accident in 2015, Holly Farrar contacted Farrar's coworker, John Shackelford, to discuss the ongoing drinking problem and suggested that Farrar may need rehab. Shackelford testified at trial and confirmed Holly was concerned Farrar was drinking too much.

As it is relevant as a guidepost for exemplary damage award considerations, there was testimony regarding the financial standing of Farrar. The record shows that Gerald Farrar and Holly Farrar's gross earnings from 2012 to 2017 averaged $176,000 per year, and to owning his home, 60 acres of land in Morehouse Parish, and owning additional acreage with his brother. Farrar received yearly raises and bonuses ranging from $10,000-$20,000 in the years following the Accident.

When the trial came to an end on April 14, 2022, the jury rendered a verdict in favor of Duran $162,556 for past and future medical expenses for injuries caused or aggravated by the Accident, plus $680,599 loss of past, present and future of income and various general damage awards, detailed above, and against Farrar and Allmerica,[4] in addition to the $3,000,000

---

[4] This Court granted summary judgment in favor of Mer Rouge State Bank on issues of vicarious liability, punitive damages, and negligent entrustment, and dismissed the claims against them. *Duran v. Allmerica Fin. Benefit Ins. Co.*, 53,615 (La. App. 2

exemplary damage award. Based on the jury's verdict, a judgment in the amount of $3,843,155 was signed by the court, and it is from this judgment that Farrar and Allmerica appeal.

## DISCUSSION

<u>**Exemplary Damages:**</u>

On appeal, Farrar presents one assignment of error related to the jury's assessment of exemplary damages against him:

> The jury's award of $3,000,000 in punitive damages (which is a ratio of almost 4:1 when compared to the $843,155 awarded as compensatory damages) is "grossly excessive" and in violation of the Due Process Clause because Farrar's conduct was not significantly reprehensible or malicious, he is not a recidivist, Duran did not establish at trial that she could have suffered more significant harm, and the award is not justified by Farrar's modest wealth. Thus, this Court should reduce the punitive damages award to no more than a 1:1 ratio, such that punitive damages would be no more than $843,155 and the total judgment in Duran's favor would be no more than $1,686,310.

The standard of review of an exemplary damages award on appeal is *de novo*. Farrar asserts the instant "grossly excessive" exemplary damage award by the jury violates his due process rights. The United States Supreme Court has held that when a defendant has properly raised a federal due process claim at the trial court level, determining whether an award of punitive damages is "grossly excessive" in violation of the Due Process Clause under the Fourteenth Amendment is subject to a *de novo* standard of review. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001); *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S. Ct. 1513, 155 L. Ed. 2d 585

Cir. 11/18/20), 306 So. 3d 611, *writ denied*, 21-00212 (La. 4/7/21), 313 So. 3d 979, and *writ denied*, 21-00202 (La. 4/7/21), 313 So. 3d 980

14

(2003). In accordance with this directive, the Louisiana Supreme Court has also adopted a *de novo* standard of review in assessing whether an award of punitive damages violates a defendant's due process rights. *Mosing v. Domas,* 02-0012 (La. 10/15/02), 830 So. 2d 967.

In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), the United States Supreme Court provided three "guideposts" to determine when an exemplary damage award crossed the constitutional line. The *BMW* factors include: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm and/or potential harm suffered by the plaintiff and the exemplary damages award; and (3) the difference between the exemplary damages awarded by the jury and the civil or criminal penalties authorized or imposed in comparable cases. *BMW of North America, Inc., supra.*

The United States Supreme Court stated that "perhaps the most important indicium of the reasonableness of a punitive damages award is the **degree of reprehensibility of the defendant's conduct**." *Id.* (emphasis added). The *BMW* Court held the most important factor was the degree of the reprehensibility of the defendant's conduct and whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*

We recognize our legislature has made clear its desire to increasingly put juries in control of determining damage awards, as evidenced by

substantially lowering the threshold of the amount in controversy eligible to be submitted to a jury from $50,000 to $10,000, effective in 2021. La. C. C. P. art. 1732. With that policy in mind, we will review each of the guideposts in determining the reasonableness of the exemplary damages awarded by this jury.

**The Degree of Reprehensibility of Farrar's Conduct**

The Louisiana legislature has identified certain behaviors which it clearly intends to dissuade. Some activities are criminalized and can include incarceration and financial penalties, which are enumerated in Title 14 of our revised statutes. To discourage other actions, it imposes treble damages, awarding a damaged plaintiff three times their actual damages in specifically enumerated circumstances.[5] In those instances, such as improperly harvesting the timber of another, the trier of fact only has to undertake the somewhat simple mathematical task of affixing the award of three times the damage amount. The formula for determining treble damages can easily be represented as [D] being damages, and multiplying that number by three. As such: treble damages = [D] x 3

Regarding the dangers inherent in driving while intoxicated, our legislature has found drunk driving to be so reprehensible that, in addition to potential criminal prosecution, it exposes the driver to exemplary damages in favor of those injured as a result. La. C. C. art. 2315.4 authorizes recovery of exemplary damages, in addition to general and special damages, when there is sufficient proof there were injuries caused by a "wanton or reckless

---

[5] Examples include La. R.S. 51:1401-1430 (the Louisiana Unfair Trade Practices Act (LUPTA), as well as the Timber Trespass Statute, La. R.S. 3:4278.1.

16

disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries." In these very limited circumstances, there is no clear-cut formula controlling the calculation of exemplary damages, other than the award must be determined on review to be reasonable under the specific facts and circumstances

Exemplary damage awards serve to punish the defendant and dissuade others from undertaking similar reprehensible conduct. It is the complexities encountered by the trier of fact in arriving at a "reasonable" amount of damages that are designed to punish and deter that we draw our focus. In this endeavor, we are guided at the outset by the Louisiana Supreme Court's considerations in *Mosing v. Domas,* 02-0012 (La. 10/15/02), 830 So. 2d 967 and *Warren v. Shelter Mut. Ins. Co.*, 16-1647 (La. 10/18/17), 233 So. 3d 568, which are cases addressing large exemplary damage awards that were challenged as grossly excessive.

A determination of the degree of reprehensibility of a certain behavior is far more than a one-step "true or false" inquiry. The Louisiana Supreme Court found that the inquiry into whether punitive damages are grossly excessive begins with balancing the reprehensibility of the act against the severity of the punitive damages award. *Mosing, supra*. The *Mosing* Court considered the following aggravating factors of particularly reprehensible conduct: the type of injury caused or that could have been caused by the conduct; the defendant's indifference to or reckless disregard for the health and safety of others; and the probability of recidivism. The reprehensibility analysis was further refined by the United States Supreme Court in *State*

17

*Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S. Ct. 1513, 155 L.Ed.2d 585 (2003), which the Louisiana Supreme Court later adopted in *Warren v. Shelter Mut. Ins. Co.*, 16-1647 (La. 10/18/17), 233 So. 3d 568. The Court provided the five following considerations: (1) whether the harm caused was physical as opposed to economic; (2) whether the conduct causing the plaintiff's harm showed indifference to or a reckless disregard of the health or safety of others; (3) whether the "target of the conduct" was financially vulnerable; (4) whether the defendant's conduct involved repeated actions as opposed to an isolated incident; and (5) whether the harm caused was the result of intentional malice, trickery, deceit, or mere accident. Farrar's actions fit squarely in each of these considerations as aggravating factors and would appear to push the needle towards making a significant exemplary damages award to deter such dangerous and harmful actions.

Duran suffered physical and significant economic harm – not only the costs of medical treatment for her injuries, but the lasting impact to her ability to work and fully enjoy her life to the fullest. Farrar's conduct of driving while intoxicated demonstrated a reckless disregard to the health and safety of others travelling on the highway. The numbers of those killed and seriously injured on Louisiana roads each year in accidents caused by drunk drivers is alarming (and completely preventable). The record demonstrates that Farrar's conduct of driving while intoxicated involved repeated actions, as opposed to this being an isolated incident as he attempts to argue. Finally, the harm caused to Duran was a direct result of Farrar's intentional malice of opting to drive while he was dangerously intoxicated; he was

18

considered by medical professionals and experts to be in the "stupor stage" of intoxication when his actions caused the Accident and resulting injuries to Duran. The record also reveals that Farrar went to great lengths to conceal the fact that he drank so heavily before choosing to drive – he refused a breathalyzer test, gave repeated false statements regarding his drinking on the day of the Accident, and failed to disclose to his employer and family members the extent of his drinking while he operated the bank's vehicle.

**Disparity Between Harm and/or Potential Harm Suffered and Exemplary Damages Awarded**

Farrar argues that his conduct was not sufficiently reprehensible or malicious to justify the damages award and that his conduct that led to the accident lacked malice. Farrar asserts that due to his personal stress and pressure from his family issues that day, his conduct was not anywhere near the extreme end of the reprehensibility spectrum. Farrar also focuses his argument on the fact that this was his first offense DWI conviction and therefore concludes that he does not qualify as a "recidivist" for purposes of the reprehensibility analysis. We disagree. Reprehensible and dangerous activity resulting in substantial damages triggers significant exemplary damages. The greater the harm and the greater the reprehensibility of the conduct, the greater the award required to achieve the deterrence necessary.

After hearing evidence presented regarding Duran's physical injuries, her inability to continue employment, and her mental distress, the jury awarded approximately $843,155 in compensatory damages, of which over $162,000 was awarded for past and future medical expenses. Those awards by the jury were not challenged as excessive by Farrar. The possible injuries to Duran or her passenger, the three individuals in the vehicle behind Duran

19

that the record indicates stopped to provide assistance, or others that crossed paths with Farrar that evening, could have easily included death or additional catastrophic injuries. The record in its entirety and the evidence at trial supported the jury's finding that Farrar possessed a behavioral pattern of driving while intoxicated on other occasions, including the probability that this was not his first time to drive intoxicated.

The timeline of events established by the record, including concerns from Farrar's wife and fellow bank employees regarding his alcohol abuse, support the apparent conclusion by the jury that Farrar was in fact a recidivist and that this was not an isolated incident. The record also establishes that Farrar displayed malice when he chose to drive drunk on the day of the accident. He repeatedly failed to disclose the truth of his consumption of alcohol that day, and often changed his story to his family and coworkers regarding the circumstances surrounding the Accident throughout the litigation, even up until the trial on the matter. The jury, rightfully so, disapproved of such actions.

Further, the record establishes Farrar's disregard for human life and safety was high based on his own testimony that he would drink alcohol and routinely drive. Farrar's high level of intoxication at the time of the accident – a 0.346% BAC hours later – is extremely alarming. The higher the BAC when one gets behind the wheel, the greater evidence of a wanton disregard for the life and safety of others. Actions exhibiting a greater degree of reprehensible conduct are deserving of greater deterrence, and that deterrence comes in the form of effective financial penalty and accountability. The considerations begin with the level of damages resulting

20

from the reprehensible conduct, and the resulting significant exemplary damages are an expected result, both in dollar figure and as a ratio to damages.

Farrar argues that the relative reprehensibility of his conduct is nowhere near egregious enough to justify a punitive to compensatory damages ratio above 1:1, and asks this Court to reduce the punitive to compensatory damages ratio to no more than 1:1 based on the particular facts of this accident. Farrar argues Duran was sufficiently compensated in general damages, and she failed to establish that greater harm could have befallen her during the accident. We disagree.

We note that exemplary damages are not designed to make the injured party whole, as that is role of special and general damages. The purpose of exemplary damages is the punishment and deterrence of reprehensible conduct of the defendant. Other than treating exemplary damages to something akin to penalties under our criminal statutes and those funds paid to the State of Louisiana, what are we to do with exemplary damages? The legislature intends the exemplary damages should be paid to the injured party, rather than some government agency or subdivision, or it would have drafted the applicable provisions of the law otherwise. This framework does not cause the injured party to be overcompensated, as it is punishment, not compensation, that is the primary focus and intent of exemplary damages..

Courts have "decline[d] again to impose a bright line ratio which a punitive damages award cannot exceed." *Warren, supra*. Ratios in excess of single-digits could raise serious constitutional questions, and single-digit ratios are "more likely to comport with due process." *Id.* Although the

21

United States Supreme Court stated "there are no rigid benchmarks that a punitive damages award may not surpass," it strongly indicated the proportion of punitive damages to harm should generally not exceed a ratio of 9 to 1. *State Farm Mut. Auto. Ins. Co. supra.* The ratio of exemplary damages against Farrar fixed by the jury was approximately 3.56 to 1.

The Court in *State Farm Mut. Auto. Ins. Co., supra,* discussed certain combinations of factors that would justify relatively higher or lower ratios. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. *Id.* The Court also minimized the relevance of criminal penalties as a guide, saying that they were not particularly helpful in determining fair notice. *Id.*

Considering the deliberations set forth above by the Louisiana and United States Supreme Courts, the following formula is helpful, with exemplary damages being the result of calculations taking into consideration the actual damages inflicted, the degree of reprehensible conduct as a multiplying factor of any fractional or whole number, and the wealth of the responsible party resulting in any fractional or whole number.

# [Damages] x [Reprehensibility] x [Wealth]

The damages, medical expenses and otherwise, were very significant in the present matter – $843,155. The reprehensibility of getting behind the wheel and driving at four times the legal limit should result in an exponential increase. Lastly, the wealth of Farrar is not significant, and therefore no further enhancement would be appropriate.

22

$$[\$843{,}155] \text{ x } [\pm 3.56] \text{ x } [1] = \$3{,}000{,}000$$
(Damages)     (Reprehensibility)     (Wealth Factor)

The record as a whole indicates that despite this being Farrar's first DWI conviction, Farrar had driven while likely and admittedly impaired numerous times. Farrar's BAC of 0.346% was almost four times the legal limit of 0.08% for operating a vehicle. The ratio of the punitive damages to the compensatory damages awarded by the jury in his case is approximately 3.56 to 1.

Louisiana courts have previously upheld an exemplary damage to compensatory damage ratio well in excess of a 1:1 ratio. In *Warren, supra*, the Court approved punitive damages in a 2:1 ratio, awarding $4,250,000.00 in exemplary damages to a plaintiff who received $2,125,000.00 in compensatory damages. In *Tingle v. Am. Home Assur. Co.*, 10-71 (La. App. 3 Cir. 6/2/10), 40 So. 3d 1169, 1174, *writ denied,* 10-1580 (La. 10/29/10), 48 So. 3d 1095, and *writ denied,* 10-1578 (La. 10/29/10), 48 So. 3d 1095, and *writ denied,* 10-1564 (La. 10/29/10), 48 So. 3d 1095, and *writ denied,* 2010-1563 (La. 10/29/10), 48 So. 3d 1096, and *writ denied,* 2010-1562 (La. 10/29/10), 48 So. 3d 1096, an intoxicated driver of an 18-wheeler ran a red light and collided with the plaintiffs' car, killing their two-year-old daughter and injuring both parents. The jury awarded approximately $2.5 million in compensatory damages and $5 million in exemplary damages – a 2:1 exemplary damage to compensatory damage ratio. The Louisiana Supreme Court in *Mosing, supra,* considered the actions of an intoxicated driver and upheld a jury award of nine times the amount of compensatory damages awarded – a ratio of 9:1.

Considering the above, we find Farrar's arguments in favor of a 1:1 ratio are without merit considering these specific facts and circumstances. It is only because Farrar caused such extensive damages that is there a correspondingly high exemplary damage award. The members of the jury were presented with ample evidence regarding Farrar's actions before, during, and after the accident which caused significant injury to Duran. We find that the 3.56:1 ratio ($3,000,000) of exemplary damages to compensatory damages in this case, under these specific factors and with this shocking level of reprehensibility, is not grossly excessive, and does not violate the Due Process Clause.

**Difference Between Exemplary Damages Awarded and Civil or Criminal Penalties Authorized**

In this case, the record shows that Farrar was convicted of DWI, first offense. Farrar's BAC of 0.346% exposed him to enhanced criminal penalties, pursuant to La. R.S. 14:98.1; however, his high BAC was not known to the judge at the time of his sentencing, and he was spared that enhancement. Farrar's criminal penalties are not the major factor to consider in determining whether the exemplary damages award in this matter is excessive. As noted in *Thistlewaite v. Gonzales*, 12-130 (La. App. 5 Cir. 12/18/2012), 106 So. 3d 238, there is not an available conversion table for incarceration versus money damages. Certainly, such an alarmingly high BAC could have resulted in a six-month jail sentence as provided in La. R.S. 14:98.1 and an extended suspension of driving privileges.

**The Added Consideration of Farrar's Wealth**

The only non-*BMW* factor traditionally considered by Louisiana courts in fixing exemplary damages is to take into consideration the

defendant's relative economic wealth. A defendant's assets and income are relevant factors that may be considered in determining whether an award of exemplary damages is excessive: "The importance of the defendant's financial situation to the goals of punishment and deterrence is obvious: What 'may be awesome punishment for an impecunious individual defendant [may be] wholly insufficient to influence the behavior of a prosperous corporation.'" *In re New Orleans Train Car Leakage Fire Litig.*, 00-0479 (La. App. 4 Cir. 6/27/01), 795 So. 2d 364, 388, *quoting Cont'l Trend Res., Inc. v. OXY USA, Inc.,* 101 F.3d 634, 641 (10th Cir.1996), *cert. denied,* 520 U.S. 1241, 117 S. Ct. 1846, 137 L. Ed. 2d 1049 (1997). However, the defendant's economic situation is only one of the factors that may be considered in determining whether an award of exemplary damages is excessive. *Id.*

Farrar argues that he and his wife earned approximately $176,000 per year from 2012 to 2017. He asserts he is an individual of normal means who has no prior history of DWI offenses; he is not a major corporation that needs significant exemplary damages to be adequately deterred from future drunk driving incidents. We note that the record does not contain any objectively verifiable evidence regarding Farrar's actual wealth aside from his income tax returns. Farrar presented evidence as to his employment history and salary, plus the existence of a retirement account and a list of assets, including residential and recreational land and properties. The record does not contain evidence as to the amount of the retirement account or the value of his other assets. Accordingly, we find that Farrar's wealth is not a major or enhancing factor in the analysis regarding the exemplary damages

award and would not be a contributing factor to further increase the ratio of exemplary damages to actual damages. Individuals with significant wealth may require proportionate exemplary damages to ensure the message regarding reprehensible conduct from the jury and society is received. However, in this case, Farrar's wealth is not a necessary additional factor.

Farrar's extreme and dangerous conduct of driving with a blood alcohol content four times the legal limit and then attempting to actively conceal that relevant fact throughout the litigation is of such a high degree of reprehensibility that we cannot say the jury's award of exemplary damages of a 3.56 to 1 ratio, or the dollar amount, was unreasonable. Considering each of the above guideposts and recognizing the degree of reprehensibility of Farrar's conduct, as well as the extent of the resulting damage to Duran, we affirm the ratio and amount of exemplary damages as reasonable.

**Suspensive Appeal Bond**

Also pending before the court is Duran's appeal regarding the suspensive appeal bond posted by Farrar and his insurer. At the conclusion of the trial, Farrar timely moved for a suspensive appeal from the May 31, 2022 judgment holding him and Allmerica liable for Duran's damages in the amount of $3,843,155. The trial court granted the motion for suspensive appeal and set the appeal bond for $5,500,000. Allmerica timely filed the suspensive appeal bond. The bond for $5,500,000 was provided by Hanover for the principals listed in the judgment, Farrar and Allmerica.

In December of 2022, Duran filed a motion to test the sufficiency and validity of the suspensive appeal bond with the trial court. On June 22, 2023, the trial court denied Duran's motion, but did order Hanover Insurance

26

Company to file an amended affidavit providing additional details regarding the process it used to approve submission of the suspensive appeal bond in this matter. On August 1, 2023, Hanover filed the amended affidavit as directed. Duran did not seek supervisory review at the time of the trial court's judgment on its motion to test the sufficiency of the suspensive appeal bond, in accordance with La. C. C. P. art. 2201, but filed its own separate devolutive appeal on the issue. In general, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment. *Martin v. Martin*, 52,401 (La. App. 2 Cir. 11/14/18), 261 So. 3d 984, 989. Accordingly, we will address Duran's arguments regarding the trial court's judgment on the suspensive appeal bond here in this consolidated appeal.

Duran asserts that Farrar's pursuit of a suspensive appeal is improper because the suspensive appeal bond is invalid. Specifically, Duran argues that the surety company securing the appeal bond, Hanover Insurance Company, is not entitled to serve as surety on the appeal bond. Duran asserts that Hanover – an excess insurer of Mer Rouge State Bank, who was dismissed from this lawsuit through a motion for summary judgment – is not entitled to serve as surety on Farrar's suspensive appeal bond.

In response to Duran's arguments on appeal relating to the suspensive appeal bond, Farrar argues that the suspensive appeal bond was issued by a reputable surety in an amount greater than the judgment plus interest, and was approved by the trial court. Farrar argues that although Hanover did issue an excess insurance policy to Mer Rouge State Bank, the jury verdict

27

and subsequent judgment in favor of Duran are not against Hanover or Mer Rouge State Bank. Thus, neither Hanover nor its named insured, Mer Rouge State Bank, have been cast in judgment in this matter.

The trial court correctly determined that Hanover is not serving as "surety for its own debt" and the suspensive appeal bond is valid, in accordance with La. C. C. P. art. 2124(E). We find Duran's arguments regarding the suspensive appeal bond are without merit. Therefore, Duran's motion to dismiss Farrar's suspensive appeal is denied, and the trial court's June 22, 2023, judgment recognizing Hanover as surety of the suspensive appeal bond is affirmed.

## CONCLUSION

We conclude that the jury's award of $3,000,000 in exemplary damages is not excessive under these specific facts and circumstances, and it does not violate the Due Process Clause of the Fourteenth Amendment. We affirm the exemplary damages ratio of 3.56 to 1 and the monetary award of $3,000,000 against Gerald Farrar. Further, we affirm the trial court's June 22, 2023 judgment recognizing Hanover as a proper surety for the suspensive appeal bond. Costs are assessed to Gerald Farrar and Allmerica.

**AFFIRMED.**